**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 31, 2004**

Charles R. Fulbruge III
Clerk

REVISED APRIL 20, 2004
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-10558
_____


SOUTHLAND SECURITIES CORPORATION,
on behalf of Itself and All Others
Similarly Situated; ET AL,

                                        Plaintiffs,


JEFFREY A. FIELKOW; RICK TAYLOR;
WILLIAM WARES; RON RUMPLER; WILLIAM WHITE,

                                        Plaintiffs-Appellants,


        versus


INSPIRE INSURANCE SOLUTIONS INC, ET Al,

                                        Defendants,

INSPIRE INSURANCE SOLUTIONS INC;
F. GEORGE DUNHAM, III; ROBERT K. AGAZZI;
TERRY G. GAINES; RONALD O. LYNN;
JEFFREY W. ROBINSON; WILLIAM J. SMITH, III;
MILLERS MUTUAL FIRE INSURANCE COMPANY,

                                        Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Texas
_____


Before GARWOOD, JOLLY, and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiffs Southland Securities Corporation, Jeffrey Fielkow, Rick Taylor, William Wares, Ron Rumpler, and William White (plaintiffs) appeal the district court's dismissal, pursuant to Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (PSLRA), of their securities fraud complaint. We affirm in part and reverse in part and remand.[1]

## Background

INSpire Insurance Solutions, Inc. ("INSpire"), the corporate defendant in this case, provided policy and claims administration to the property and casualty insurance industry and offered outsourcing and software services. In this securities-fraud class action, the defendants are INSpire; Millers Mutual Fire Insurance

---

[1]When this appeal was initially filed one of the appellees was Millers Insurance Company, formerly known as Millers Mutual Fire Insurance Company, a defendant below ("Millers"). Liability against Millers was asserted solely as a "control person" under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). Millers was represented separately and had filed its own appellee's brief in this case. Thereafter, a letter dated March 19, 2003, was received by the court from Millers's counsel, advising of Millers's status as an "Impaired Insurer" under Texas Ins. Code Art. 21.28-C. The 345th Judicial District Court of Travis County found that Millers was insolvent and appointed the Texas Commissioner of Insurance as its permanent receiver under the Texas Insurance Code and issued a permanent injunction. The receiver discharged Millers's counsel. The receiver has not become, or sought to become, a party to this case, and no other party to this case has sought to make the receiver a party. This court in a June 27, 2003 order severed the appeal of plaintiffs-appellants as against Millers from and out of the remainder of this appeal and stayed the said severed out appeal against Millers pending further order of this court, and said severance and stay of said severed appeal remain in effect. This opinion does not dispose of said severed out appeal as against Millers.

2

Company, allegedly the original parent corporation and largest shareholder of INSpire (see note 1 above); F. George Dunham (Dunham), the President, CEO and Chairman of the Board of INSpire during the class period; Ronald O. Lynn (Lynn), Executive Vice President and CIO during the class period; Terry G. Gaines (Gaines), Executive Vice President, CFO, and Treasurer during the class period; Robert K. Agazzi (Agazzi), Executive Vice President of Software and Systems during the class period; Jeffrey W. Robinson (Robinson), Executive Vice President of Outsourcing and later President and COO during the class period; and William J. Smith (Smith), President and COO from May 1, 1998 to January 7, 2000, (collectively defendants). INSpire was established in 1995 as a wholly owned subsidiary of Millers, and remained such until August 1997 when Millers spun it off through an initial public offering (IPO) of 8.25 million shares, Millers retaining 43.7 percent of INSpire's outstanding shares. Plaintiffs generally contend that defendants engaged in a fraudulent scheme to deceive investors about the company's performance for the purpose of inflating the price of INSpire stock for their own financial benefit. The proposed plaintiff class consisted of all those who acquired INSpire common stock between January 28, 1998, and October 14, 1999.

The plaintiffs' Second Amended Complaint (Complaint), from the dismissal of which this appeal is taken, alleges that the

3

defendants committed securities fraud by knowingly, or with severe recklessness, touting INSpire's software products[2] and contracts despite the software's critical flaws; issuing inaccurate earnings and revenue estimates; and violating Generally Accepted Accounting Principles (GAAP) by failing to timely classify receivables as uncollectible, improperly capitalizing software development costs, and failing to write down goodwill associated with purchases of software assets. The plaintiffs allege these misleading statements were made in forward-looking statements, press releases, and other corporate documents, and relied upon by analysts in their reports. The plaintiffs further allege defendants made stock sales based on insider information, pointing to these sales as evidence of scienter. The plaintiffs seek to recover damages on behalf of all persons who acquired Inspire stock between January 28, 1998 and October 14, 1999.

On December 3, 1999, the plaintiffs, on behalf of themselves and others similarly situated, filed their original complaint against the defendants. This case was consolidated with substantially identical suits subsequently filed by other

---

[2]INSpire's two principal software programs were EmPower and Windows for Property Casualty (WPC). EmPower is an imaging and workflow management application designed to allow the user to create electronic images of insurance applications and forms that can be routed and traced when used in conjunction with an electronic policy and claims administration system. INSpire's first policy and claims administration system was called Policy and Claims Administration (PCA) and ran on the AS400 platform while its successor WPC ran on a Windows platform.

plaintiffs. On June 7, 2000, the plaintiffs filed their Consolidated Amended Complaint. On August 10, 2000, the defendants filed motions to dismiss the plaintiffs' Consolidated Amended Complaint, which motions were granted by the Court on March 12, 2001. In that Dismissal Order, the court found that, because the plaintiffs' Consolidated Amended Complaint had failed to plead fraud with particularity and improperly relied on the "group pleading" doctrine in lodging allegations against the defendants collectively, the plaintiffs did not meet the pleading requirements established by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (PSLRA). The court held that the plaintiffs must plead with sufficient particularity wrongdoing and scienter as to each defendant individually. The court also found the plaintiffs failed to allege facts supporting an inference that the forward-looking statements cited in the Consolidated Amended Complaint were made with actual knowledge that they were false or misleading.

The court gave the plaintiffs an opportunity to amend their Complaint. They filed their Second Amended Complaint[3] on May 16, 2001. The defendants filed responsive motions to dismiss. The plaintiffs asserted claims under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange

[3]Although the plaintiffs title this pleading "First Amended Complaint" the district court correctly noted the it is actually the Second Amended Complaint, the first amended pleading being the Consolidated Amended Complaint filed on June 7, 2001.

5

Commission (SEC), as modified by the PSLRA, codified in relevant part at 15 U.S.C. §§ 78u-4 and 78u-5, against all of the defendants except Millers. The plaintiffs also asserted claims under section 20(a) of the Securities Act, 15 U.S.C. § 78t(a), which provides for control-person liability, against INSpire, Millers, and Dunham.

## Discussion

*Standard of Review*

This court reviews the dismissal of a complaint for failure to state a claim *de novo*, accepts "the facts alleged ... as true and construe[s] the allegations in the light most favorable to the plaintiff." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). However, we will not "strain to find inferences favorable to the plaintiffs." *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996). Nor do we accept conclusory allegations, unwarranted deductions or legal conclusions. *Nathenson*, 267 F.3d at 406. A dismissal for failure to plead fraud with particularity as required by rule 9(b) is a dismissal on the pleadings for failure to state a claim. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir. 1993).

*Securities Exchange Act and PSLRA*

Section 10(b) of the Securities Exchange Act provides in relevant part:

"It shall be unlawful for any person, directly or indirectly

. . .

(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (2000).

Rule 10b-5 provides in relevant part:

"It shall be unlawful for any person, directly or indirectly

. . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .

in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (2001).

The PSLRA speaks to the requirements of a securities law class action complaint as follows:

"**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant –

**(A)** made an untrue statement of a material fact; or

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons

7

why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

**(3) Motion to dismiss; stay of discovery**

**(A) Dismissal for failure to meet pleading requirements**

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met."  15 U.S.C. § 78u-4(b).

Federal Rule of Civil Procedure 9(b) likewise requires the plaintiffs in securities fraud causes to plead with particularity the circumstances constituting the alleged fraud.  To satisfy Rule 9(b)'s pleading requirements, the plaintiffs must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 412 (1997).  To state a securities-fraud claim under section 10(b), and Rule 10b-5, plaintiffs must plead (1) a misstatement or omission;

8

(2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries. *Id.* at 177. A fact is material if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir. 1985) *(quoting TSC Industries, Inc. v. Northway, Inc.*, 96 S. Ct. 2126, 2131 (1976)). Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 108 S. Ct. 978, 988 (1988).

"A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Williams,* 112 F.3d at 178. This court has noted that "although the requirement for particularity in pleading fraud does not lend itself to refinement, and it need not in order to make sense, nevertheless, directly put, the who, what, when, and where must be laid out *before* access to the discovery process is granted." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002) (quotations omitted). "In securities fraud suits, this heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents

9

plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman v. DSC Communications*, 14 F.3d 1061, 1067 (5th Cir. 1994).

The PSLRA reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading. *Williams,* 112 F.3d at 177.[4] The PSLRA *also* requires that the complaint "with respect to *each* act or omission alleged" to be false or misleading "state with *particularity facts* giving rise to a *strong* inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).

*Group Pleading*

This court has not heretofore considered whether to recognize the "group pleading" or "group published" doctrine. This doctrine "allows plaintiffs to 'rely on a presumption that statements in "prospectuses, registration statements, annual reports, press

_____

[4]For purposes of the requirement of § 78u-4(b)(1) that "if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed," an allegation not made on the plaintiff's personal knowledge is treated as made on information and belief "although not labeled as such." *Tchuruk*, 291 F.3d at 351. However, the requirement that "all" facts be plead is not literally applied; sufficient particular facts is the intent of that requirement. *Id*. at 352-53.

releases, or other group-published information," are the collective work of those individuals with direct involvement in the everyday business of the company.'" *In Re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (quoting *In Re Stratosphere Corp. Securities Litig.*, 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998)); *Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 939 n.9 (N.D. Ill. 1999).

Where the misstatements appear in certain types of documents that plaintiffs believe were written by groups, some courts have allowed plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the "group" that likely put the challenged documents together. *In re Solv-Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276, 283 (S.D.N.Y. 2000); *In re Worlds of Wonder Sec. Litig.*, 721 F. Supp. 1140, 1143 (N.D. Cal. 1989). Instead of being required to plead that a defendant actually made, authored or approved an offending statement in a corporate communication, the "group pleading" doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles. Under this doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are "insiders or affiliates" of the company. *In re Solv-Ex Corp. Sec.*

11

*Litig.*, 210 F. Supp. 2d at 283.  Therefore, the "group pleading" doctrine as so applied would allow the plaintiff to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud.

Congress did not include "group pleading" in any provision of the Securities Act.  *See* William O. Fisher, *Don't Call Me a Securities Law Groupie: The Rise and Possible Demise of the "Group Pleading" Protocol in 10b-5 Cases*, 56 Bus. Law. 991 (2001).[5]  The Ninth and Second Circuits have largely pioneered this doctrine.  In *Wool v. Tandem Computers Inc.*, 818 F.2d 1433 (9th Cir. 1987), the Ninth Circuit fashioned the "group pleading" doctrine, holding:

> "In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where *possible* the roles of the individual defendants in the misrepresentations."  *Id.* at 1440 (citation omitted) (emphasis added).[6]

---

[5]Fisher discusses the structure of modern corporations, noting their often varying degrees of compartmentalization and the fact that an individual's actual role in drafting and approving particular documents and statements cannot, in many cases, be reliably deduced from their title.

[6]The *Wool* court added, "The individual defendants are a narrowly defined group of officers who had direct involvement not only in the day-to-day affairs of Tandem in general but also in Tandem's financial statements in particular."  *Id.*  Yet, this

12

Courts have differed as to whether the "group pleading" doctrine, assuming its existence prior to the PSLRA, survives that 1995 legislation. The PSLRA requires first, that the complaint must "specify" "each" statement alleged to have been misleading, and the reason or reasons why that statement is misleading. 15 U.S.C. § 78u-4(b)(1). Second, as to allegations made upon information and belief, the complaint must "state with particularity all facts" on which the belief is formed. *Id.* Finally, as to "each" allegedly misleading statement, the complaint must "state with particularity facts giving rise to a strong inference that *the* defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).

Several courts have held that, largely because the PSLRA does not explicitly make reference to the "group pleading" doctrine, it does not abolish it. *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 17 (D.D.C. 2000); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999); *In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 987 (E.D. Mo. 1999); *Zuckerman v. Foxmeyer Health Corp.*, 4

---

finding appeared unnecessary as a result of the Court's apparent conclusion that such facts only need to be alleged "where possible."

13

F. Supp. 2d 618, 627 n.4 (N.D. Tex. 1998); *Robertson v. Strassner*, 32 F. Supp. 2d 443, 446 (S.D. Tex. 1998). However, several other courts have found that the PSLRA effectively abolished the "group pleading" doctrine. *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp.2d 589, 618-21 (D.N.J. 2001); *Coates v. Heartland Wireless Communs., Inc.*, 26 F. Supp.2d 910, 915-16 (N.D. Tex. 1998); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1350 (S.D. Cal. 1998); *Chu v. Sabratek Corp.*, 100 F. Supp.2d 827, 835-37 (N.D. Ill. 2000).

Significantly, this court has never adopted the "group pleading" doctrine, even before the PSLRA. While the PSLRA does not explicitly abolish the doctrine, it was not necessary to do so because Congress never made this judicial creation law to begin with. Even prior to the PSLRA, section 10(b) and Rule 10b-5 required plaintiffs to identify the roles of the individual defendants, and describe their involvement, if any, in preparing the misleading statements. *In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785, 795 (S.D. Cal. 1990). Even if this court were to conclude that the "group pleading" doctrine existed in the absence of the PSLRA, it cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pleaded with regard to "each act or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state

14

of mind." 15 U.S.C. § 78u-4(b). These PSLRA references to "the defendant" may only reasonably be understood to mean "each defendant" in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions. The court in *Allison* noted:

> "[T]o permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant. The group published doctrine permits an inference of wrongdoing not based on defendant's conduct, but based solely on defendant's status as an officer or director of a corporation." *Allison*, 999 F. Supp. at 1350.

The "group pleading" doctrine conflicts with the scienter requirement of the PSLRA because, even if a corporate officer's position supports a reasonable inference that he likely would be negligent in not being involved in the preparation of a document or aware of its contents, the PSLRA state of mind requirement is severe recklessness or actual knowledge.

Therefore, we agree with the district court that the PSLRA requires the plaintiffs to "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." As such, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within

15

documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement. Various unattributed statements within documents may be charged to different individuals, and specific facts may tie more than one individual to the same statement. And, the corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation.

Consistent with our rejection of the "group pleading" doctrine, we do not construe allegations contained in the Complaint against the "defendants" as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded. While the plaintiffs aver in paragraph 21 of the Complaint that the individual defendants "each controlled the contents of and participated in writing INSpire's SEC filings, reports and releases," this conclusory allegation fails to specify which of these documents is attributable to each individual

16

defendant, let alone which portions or statements within these documents are assignable to each individual defendant.

*Corporate defendant*

Respecting the potential section 10(b) liability of INSpire itself, however, as all of the individual defendants were executive officers of INSpire whose actions were intended to benefit INSpire, we will treat as having been made by INSpire the particular complained of statements in the SEC filings, reports and releases issued in its name. Statements attributed to individual defendants are also treated as having been made by INSpire, as all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company.

Nevertheless, liability under Rule 10(b)(5) requires not only that the party make a statement which contains an untrue statement of material fact or omits a material fact necessary in order to make the statement not misleading, but also that the party have done so with "not merely simple or even inexcusable negligence" but rather with "scienter" meaning an "intent to deceive, manipulate, or defraud" or that "severe recklessness" in which the "danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc). For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b)

17

scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.[7]  *See, e.g., Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) ("there is no case law supporting an independent 'collective scienter' theory"); *In Re Apple Computer, Inc. Securities Litigation*, 243 F. Supp.2d 1012, 1023 (N.D. Cal. 2002) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false.  A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement," citing *Nordstrom*).[8]  This is consistent

---

[7]We are, of course, speaking here of § 10(b) liability, not liability under § 20(a) of the Securities Act, 15 U.S.C. § 78t(a).

[8]Cf. *In Re Warner Communications Securities Litigation*, 618 F. Supp. 735, 752 (S.D.N.Y. 1985), *aff'd* 798 F.2d 35 (2d Cir. 1986) ("As to Warner, plaintiffs *arguably* need only show either that one or more members of top management knew of material information indicating an earnings decline, but failed to stop the issuance of misleading statements or to correct prior statements that had become misleading, or that Warner management

18

with the general common law rule that where, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency.[9]  See Restatement (2nd), Agency § 275, comment b; § 268 comment d.  *See, also*, *e.g.*, *Woodmont, Inc. v. Daniels*, 274 F.2d 132, 137 (10th Cir. 1959) ("while in some cases, a corporation may be held constructively responsible for the composite knowledge of all of its agents, whether acting in unison or not . . . [citations] we are unwilling to apply the rule to fix liability where, as here, intent is an essential ingredient of tort liability as for deceit.  *See* Restatement, Agency 2d, § 275, comment b"); *Gutter v. E.I. DuPont de Nemours*, 124 F. Supp. 2d 1291, 1311 (S.D. Fla. 2000) ("The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents," citing, *inter alia*,

_____

had recklessly failed to set up a procedure that insured the dissemination of correct information to the marketplace;" (emphasis added)).

[9]Although if the agent, with the requisite actual state of mind, makes or causes to be made a misrepresentation, the principal's vicarious liability will be determined under general rules of agency. *See Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1118 (5th Cir. 1980).

19

*Woodmont Inc.*); *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988), *aff'd*, 869 F.2d 175 (2d Cir. 1989) ("While . . . a corporation may be charged with the collective knowledge of its employees, it does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee. A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual"); *United States v. LBS Bank-New York, Inc.,* 757 F. Supp. 496, 501 n.7 (E.D. Pa. 1990) ("Although . . . a corporate defendant is considered to have acquired the collective knowledge of its employees . . . [citations], specific intent cannot be aggregated similarly," citing *First Equity Corp.*, and its last above quoted sentence).

The Complaint does not assert that any particular individual INSpire director, officer or employee, *other than* the named individual defendants, acted with scienter in or respecting the making or issuing of any of the complained of statements (or in ordering or approving any of such statements or furnishing information or language for inclusion therein or omission therefrom, or the like) or indeed in any other respect. Accordingly, for purposes of evaluating whether the Complaint states with particularity facts giving rise to a strong inference that INSpire had the requisite scienter – namely an intent to

20

deceive, manipulate or defraud or equivalent severe recklessness –
respecting any of the complained of statements, it is only
necessary for us to address the allegations claimed to adequately
show such state of mind on the part of the individual defendants.

*Insider Sales*

As supportive of their scienter claims, plaintiffs allege
diverse INSpire stock sales by the individual defendants, stating
that together they sold over 1.5 million shares of INSpire stock
during the entire class period for proceeds totaling approximately
$9.6 million.[10]   Complaint, ¶ 143-145.   With respect to the

_____

[10]The total is nearly $34 million including some $24.8
million sales by Millers (representing 20.56% of its holdings).
    For the first time on appeal, the plaintiffs, relying on
*United States v. O'Hagan,* 117 S.Ct. 2199, 2206-07 (1997), further
assert that these insider stock sales themselves are actionable
as deceptive devices or acts under the securities laws,
irrespective of whether the defendants made any misleading
statements.  This contention presents no ground for reversal.  In
an implied private action under § 10(b) and Rule 10(b)(5) the
plaintiff must allege reliance and causation. *Nathenson*, 267
F.3d at 413-15.  *See also* 15 U.S.C. § 78u-4(b)(4) & § 78u-
4(e)(1).  Where, as here, the suit is cast as a class action,
reliance necessarily means fraud on the market.  *Id*.  Here the
class is alleged to consist merely of those who *acquired* INSpire
common stock between January 28, 1998, and October 14, 1999, and
thus necessarily depends on the theory that the complained of
conduct artificially *inflated* the price of the stock, and indeed
that is what the Complaint pleads, stating "Plaintiffs and the
Class would not have purchased or acquired INSpire stock at the
prices they paid, or at all, if they had been aware that the
market prices had been artificially and falsely inflated by
defendants' misleading statements."  Complaint, ¶ 155.  Yet
plaintiffs do not allege that any of the sales by the individual
defendants were not known to the market or were not timely and
properly publically reported (as, indeed, defendants' SEC filings
submitted below, which the district court could properly
consider, see, e.g., *Lovelace v. Software Spectrum*, 78 F.3d 1015,

21

requirement that particular facts be pled which give rise to a strong inference of scienter, allegations of insider trading are essentially a form of motive and opportunity allegations. *See, e.g., In Re Comshare Inc. Securities Litigation*, 183 F.3d 542, 553 (6th Cir. 1999) (allegations "that the individual Defendants did profit by selling many of their shares at artificially inflated prices during the class period. . . . largely tend to illustrate that Defendants had the motive and opportunity to commit securities fraud"). And, we have stated that "our court requires more than allegations of motive and opportunity to withstand dismissal." *Goldstein v. MCI Worldcom*, 340 F.3d 238, 250-51 (5th Cir. 2003). Nevertheless, we have also recognized that "appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter." *Nathenson*, 267 F.3d at 412. However, this is true of insider trading "only" when "in suspicious amounts or at suspicious times." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 435 (5th Cir. 2002). *See also In Re Silicon Graphics Inc. Securities Litigation*, 183 F.2d 970, 987 (9th Cir. 1999) ("insider trading is suspicious only when dramatically out of line with prior

---

1018 (5th Cir. 1998), reflect that they were, which plaintiffs have never disputed). While the Complaint alleges that the individual defendants' stock sales were illegal insider trading because based on an unspecified non-public information, nowhere does the Complaint ever infer the wholly implausible conclusion that any of the sales by the individual defendants in fact did, or would tend to, *inflate* the market price (nor is it alleged that any of the class purchased from any individual defendant or relied on their stock sales).

22

trading practices at times calculated to maximize the personal benefit from undisclosed inside information," internal quotation marks and citation omitted).

Based on their January 1998 holdings, the plaintiffs allege that during the entire class period Agazzi sold 32.13 percent of his shares, Dunham 41.14 percent, Gaines 14.87 percent, Lynn 41.70 percent, and Robinson 48.80 percent. Complaint, ¶ 145. The plaintiffs allege three periods of insider sales: March 26, July 27-August 5, and November 3-9, 1998. Plaintiffs do not expressly allege in the Complaint that the sales were suspicious in timing or amount and therefore suggestive of scienter, although they do allege that the defendants "profit[ed] from the artificial inflation of INSpire's stock price their violation of law had created before INSpire's stock price crashed . . . ." Complaint, ¶ 143.[11]

The March sales occurred during the company's secondary public offering. On March 26, 1998, INSpire filed its prospectus and registration statement and made its secondary public offering covering 1,500,000 shares owned by it and 800,000 shares owned by then selling shareholders. On March 26, Dunham sold 157,500

---

[11]After listing the defendants' stock sales during the entire class period, the Complaint notes, "In contrast, from the time of INSpire's IPO [August 1997] until the beginning of the Class Period [January 1998], defendants sold no stock." Complaint, ¶ 145. However, the brevity of the period addressed by this allegation (and the fact that it commences with INSpire's ceasing to be a wholly owned Millers' subsidiary) largely dissipates any significance it might otherwise have.

shares, accounting for 26.40 percent of his January 1998 holdings. On March 26, Lynn also sold 30,000 shares, representing 26.62 percent of his 1998 holdings, while Robinson sold 37,500 shares, which amounts to 33.27 percent of his 1998 holdings. While not insubstantial, these sales do not raise a strong inference of scienter for several reasons. First, the plaintiffs do not allege that officer or director sales during a secondary public offering are unusual. The price of INSpire stock on March 26, 1998, was $21, significantly less than its eventual high of over $35 reached in November 1988 (it traded at $30 or above from November 3 through November 10). Furthermore, following the allegedly misleading February 24 Sul America contract announcement, INSpire stock rose from $17.917 (on February 23) to $19.833 (on February 25) (it had been as high as $19 on February 9; it traded as low as $17.50 in early March and over $21.00 from March 16 through March 24) but the defendants sold their stock at approximately this same price after over a month had passed. Moreover, the stock generally continued to climb until the revelations of December 11, 1998, suggesting the timing of the March sales was not unusually prescient. The fact that defendants Agazzi, Gaines, and Smith did not sell in or around March 1998 also undermines an inference of scienter (indeed, Smith did not sell INSpire stock at any time during the entire class period). The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that

24

defendants delayed notifying the public so that they could sell their stock at a huge profit. *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995).

The July-August sales are also not inherently suspicious. First, Agazzi, Lynn, and Smith did not sell at this time. Combining his sales on July 27 and 28, Dunham sold only 4.27 percent of his shares. Combining his sales on July 30 and August 5, Robinson sold 9.97 percent of his shares. Several weeks later, on August 18, 19, and 20, Agazzi sold 32.13 percent of his shares. Additionally, the price of INSpire stock was not unusually volatile during the July-August interval in which these sales occurred, as it was $24.375 on July 27 and $26.625 on August 20. The low between July 27 and August 20 was $22.167 on July 21 while the high was $26.625 on August 20.

The plaintiffs' strongest argument concerns sales made in November 1998. Dunham, Gaines, Lynn, and Robinson made sales between November 3 and November 9. On November 4 and 5, Dunham sold 69,150 shares, 16.45 percent of his holdings. On November 3, Gaines sold 10,000 shares, 14.87 percent of his shares. On November 4, Lynn sold 17,000 shares, 20.55 percent of his holdings. On November 9, Robinson sold 10,000 shares, 14.77 percent of his holdings. These sales of INSpire stock at between $30 and $31 were not perfectly timed, as INSpire stock would hit a high of 35.25 on November 23, 1998. However, these sales occurred only slightly

25

more than a month before INSpire stock fell precipitously from $30.813 on December 10, 1998, to $17.625 on December 11, 1998, the day INSpire issued a release revising downward its 1999 earning estimates. INSpire stock would never reach 22 again. The November sales also closely followed INSpire's announcement of its Arrowhead outsourcing contract on November 1, 1998 and the favorable analyst reports it spawned on November 2 and 3. INSpire stock rose from $22.750 on October 27, 1998, to $31.438 on November 5, a 27.64 percent increase in the share price in a span of ten days.[12]

*Alleged misstatements*

The plaintiffs' allegations of fraud against the defendants essentially relate to: 1) misstatements relating to the functionality and capacity of INSpire's software programs; 2) misstatements relating to INSpire's past, present, and projected economic performance; and 3) misstatements in financial reports consisting of violations of generally accepted accounting principles (GAAP) pertaining to classification of receivables,

---

[12]The defendants also point to their numerous alleged stock purchases during the entire class period, but the plaintiffs compellingly argue that these acquisitions were through options enabling them to purchase INSpire stock at far below the market price. For example, the plaintiffs aver that Dunham exercised 100,981 options on December 24, 1998, and March 26, 1999, paying only 87 cents per option when the open-market price of INSpire shares was $16 and $17 respectively. In any event, the effect of such purchases was not addressed in the district court's opinion and would be more appropriately addressed at trial or on summary judgment than in a dismissal on the pleadings.

software development costs, and goodwill. The plaintiffs allegations relating to INSpire's software and those relating to its stated fiscal performance are intertwined to the extent that much of the Complaint argues that the inadequacies of INSpire's software caused the company to be unable to deliver on its software contracts, resulting in subpar performance and INSpire's ultimate collapse.

The plaintiffs' allegations are divided into five time sub periods within the overall January 28, 1998, to October 14, 1999, class period.

*January 28, 1998 – April 2, 1998*

We first examine the period of January 28, 1998, to April 2, 1998. The Complaint alleges INSpire issued results for the fourth quarter of 1997 and the year ended 1997, listing Dunham and Gaines as contact persons. Complaint, ¶ 39. The plaintiffs allege this statement and all of the statements set forth in the Complaint made during this sub period were false when issued and that each such statement failed to disclose information about adverse conditions in and then impacting INSpire's business, disclosure of which was required to make the statements made not misleading, and which information was "then known only to the defendants due to their access to internal INSpire data." Complaint, ¶ 57. The plaintiffs further allege that INSpire's reported revenues and earnings during this class period were materially overstated due to improper

27

revenue recognition, failure to write off uncollectible receivables, improper capitalization of software development costs, and failure to write down goodwill from INSpire's purchase of Strategic Data Systems (SDS) in violation of GAAP. ¶ 57 (k).

The plaintiffs' allegation that the defendants committed fraud by reporting the company's results for the fourth quarter of 1997 and year end 1997 fails to meet the pleading requirements outlined above because the plaintiffs fail to explain how or in what particulars the reported earnings and revenues figures were inaccurate, and their conclusory allegation that the defendants knew the figures were false relies on "group pleading" and fails to plead facts with the requisite specificity to generate a strong inference of scienter. An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss. "Such allegations must have corroborating *details* regarding the contents of allegedly contrary reports, their authors and recipients." *Abrams*, 292 F.3d at 432 (emphasis added). *See also Goldstein v. MCI Worldcom*, 340 F.3d 238, 253 (5th Cir. 2003) (following *Abrams* and noting that there the allegations "that the individual defendants (the CEO and CFO) received daily, weekly, and monthly financial reports that appraised them of the company's true financial status" were insufficient and overly general); *Tchuruk*, 291 F.3d at 358 (allegations concerning 'regular reports' from specified subsidiary

28

to parent and to parent's CEO and named member of executive committee insufficient because "any such 'regular reports' are insufficiently identified as to who prepared them and how frequently they were prepared"); *id.* at 356 ("a plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them;" internal quotations and citation omitted).

Next, the plaintiffs allege that "INSpire held a telephonic conference call for" securities analysts, money and portfolio managers, institutional investors, large shareholders, brokers and stock traders subsequent to the release of the fourth quarter 1997 results in which they announced seven new contracts, and that "Dunham and Gaines . . . [d]uring the call – and in follow-up conversations with participants" – made generally positive statements about demand for INSpire's products and services, predicted $46 million in revenues for 1998, and earnings per share of $.60 and $.86 in 1998 and 1999, respectively. ¶ 40. The plaintiffs cite a January 30, 1998, Raymond James & Associates report on INSpire that relied on the new contracts and forecasted earnings outlined in the conference call and in follow up conversations "with Dunham and/or Gaines." ¶ 42.

The defendants argue that these alleged false statements in paragraph 40 and many others in the Complaint constitute "forward-looking statements" protected by the PSLRA's safe harbor

provision.[13]    15  U.S.C.  §  78u-5(c)(1)(A).    A  "forward-looking

statement,"  which  can  be  either  written  or  oral,  is  defined  under

15  U.S.C.  §  77z-2(i)(1)  as:

> "(A)  a  statement  containing  a  projection  of
> revenues,  income  (including  income  loss),  earnings
> (including  earnings  loss)  per  share,  capital
> expenditures,  dividends,  capital  structure  or  other
> financial  items'
> (B)  a  statement  of  the  plans  and  objectives  of
> management  for  future  operations,  including  plans
> or  objectives  relating  to  the  products  or  services
> of  the  issuer;
> (C)  a  statement  of  future  economic  performance,
> including  any  statement  contained  in  a  discussion
> and  analysis  of  financial  condition  by  the
> management  or  in  the  results  of  operations  included
> pursuant  to  the  rules  and  regulations  of  the
> Commission  .  .  ."

To  avoid  the  safe  harbor,  plaintiffs  must  plead  facts  demonstrating

that  the  statement  was  made  with  actual  knowledge  of  its  falsity.

*Id.* at  §  78u-5(c)(1)(B); *Nathenson*,  267  F.3d  at  409.    The  safe

harbor  has  two  independent  prongs:  one  focusing  on  the  defendant's

cautionary  statements  and  the  other  on  the  defendant's  state  of

mind.    15  U.S.C.  §§  77z-2(c)(1)(A),  78u-5(c)(1)(A)  (1996);  15

U.S.C.  §§  77z-2(c)(1)(B),  78u-5(c)(1)(B)  (1996).    Under  the  first

prong,  there  is  no  liability  if,  and  to  the  extent  that,  the

forward-looking  statement  is:  (i)  "identified  as  a  forward-looking

statement,  and  is  accompanied  by  meaningful  cautionary  statements

identifying  important  factors  that  could  cause  actual  results  to

---

[13]Defendants  refer  the  court  to  ¶¶  40,  42-45,  56,  59,  67,  76-
79,  88,  99,  101-103,  and  105.

differ materially from those in the forward-looking statement," or (ii) "immaterial." *Id.* at §§ 77z-2(c)(1)(A), 78u-5(c)(1)(A). Under the second prong, there is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was made with actual knowledge that the statement was false or misleading, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading. *Id.* at §§ 77z-2(c)(1)(B), 78u-5(c)(1)(B). The requirement for "meaningful" cautions calls for "substantive" company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors. H.R. CONF. REP. NO. 369, 104th Cong., 1st Sess. 31, 44 (1995). Oral statements can qualify for the safe harbor if (i) the statement is accompanied by a cautionary statement that the "particular" oral statement is forward-looking and that actual results could differ materially (essentially a formality as to the form of the statement); (ii) the statement is accompanied by an oral statement that additional information that could cause actual results to differ materially is contained in a readily-available written document; (iii) the statement identifies the document or portion thereof containing the additional information; and (iv) the identified document itself contains appropriate cautionary

31

language. 15 U.S.C. §§ 77z-2(c)(2), 78u-5(c)(2) (1996). Readily available written documents for this purpose include documents filed with the SEC or generally disseminated. *Id.* at §§ 77z-2(c)(3), 78u-5(c)(3).

With regard to the five alleged misstatements cited in paragraph 40, the predictions of future earnings and revenues in these statements meet the PSLRA's definition of a forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(A). However, the defendants have not shown that these statements were identified as forward-looking statements. Accordingly, the plaintiffs may properly allege a claim based on these statements if they were made with *actual* knowledge that they were false or misleading. However, the second and third statements of the five in paragraph 40 are non-actionable puffery, as they are "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) (citation omitted). Because analysts "rely on facts in determining the value of a security," these statements "are certainly not specific enough to perpetrate a fraud on the market." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are

immaterial. *Rosenzweig*, 332 F.3d at 869.

It is arguable whether the plaintiffs adequately allege when this conference call, and therefore these statements, took place. Although the Complaint does not date the conference call, it states that it occurred after INSpire released its December 31, 1997, results and, because paragraph 41 of the Complaint alleges INSpire's stock price rose following this call between January 27 and 29, the implication is that the call occurred between January 25 or 26 and January 27, or at least between January 1 and January 27. Although Rule 9(b) does not require that a specific date and time always be alleged as to each misrepresentation, several courts have held that simply "outlin[ing] a four-month window during which all of the misrepresentations occurred . . . does not satisfy the pleading standard of rule 9(b)." *Skylon Corp. v. Guilford Mills, Inc.*, No. 93 5581, 1997 U.S. Dist. LEXIS 2104, *6 (S.D.N.Y. Mar. 3, 1997); accord *Doehla v. Wathne Ltd., Inc.*, 1999 U.S. Dist. LEXIS 11787, No. 98 6087 (S.D.N.Y. Aug. 3, 1999) (holding that an allegation that statements were made over the course of a four-month period is insufficient for Rule 9(b) purposes). However, given the context we will assume arguendo that this allegation provides sufficient notice to the defendants to meet the "when" requirement under Rule 9(b).

We agree with the district court that the alleged statements contained in paragraph 40 are not supported by sufficient

33

particular facts to give rise to a strong inference of knowing falsity. Several of the statements, as noted above, are so general as to constitute puffing. And, the "Dunham or Gaines" allegations (¶ 42) insufficiently charge either one. Further, the plaintiffs fail to provide sufficient facts to raise a strong inference of scienter as to the falsity of the revenue and earnings projections when made. The closest the plaintiffs come is in paragraph 57(k) of the Complaint where they allege "INSpire's reported revenues and earnings were materially overstated due to improper revenue recognition, failure to write off uncollectible receivables, improper capitalization of software development costs and failure to write down SDS goodwill in violation of Generally Accepted Accounting Principles." The plaintiffs, however, fail to plead facts demonstrating that any of the individual defendants actually knew ,or were severely reckless in not knowing, of these alleged infirmities. The plaintiffs' Complaint pleads more facts relating to scienter as to the flaws in INSpire's software that formed the basis of the contracts underlying these estimates, but the alleged shortcomings of INSpire's software do not adequately show scienter on the part of any particular individual defendant respecting projected revenues and earnings that assume the terms of INSpire's contracts will sufficiently be met.

Paragraphs 40 through 42 concern statements made by analysts and brokers in reports on INSpire. Generally, securities issuers

34

are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have "sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions 'attributable to [the issuers].'" *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980); *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 743 (8th Cir. 2002). In order to attribute third-party statements to the defendants, the investors must demonstrate that the statements were adopted by the defendants or attributable to the defendants in some way, such as when officials of a company "have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views." *Elkind*, 635 F.2d at 163; *Navarre*, 299 F.3d at 743. The investors could also allege that the defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market. *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997); *Navarre*, 299 F.3d at 743. The plaintiff must plead with particularity how these exceptions apply, including who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst. *Navarre,* 299 F.3d at 743; *Raab* v. *General Physics Corp.*, 4 F.3d 286, 288 (4th Cir. 1993). Since the allegation of entanglement is central to the

35

overall allegation of securities fraud, it must be pleaded with the required degree of specificity. *In re Caere Corporate Sec. Litig.*, 837 F. Supp. 1054, 1059 (N.D. Cal. 1993). The pleading should (1) identify the specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987). However, analysts' statements that reflect their own opinions or forecasts may not be charged to the defendants because the plaintiffs have not sufficiently alleged entanglement and the adoption of such statements by the defendants.

The analysts' statements in paragraphs 42 through 44 consist primarily of forward-looking statements for which the plaintiffs do not allege facts sufficient to create a strong inference of scienter on the part of defendants and statements of analysts' own opinions for which the defendants are not liable. Also, the plaintiffs fail to explain how these statements were false or misleading due to material omissions when they were made.

The statements in paragraph 45 allegedly made by Dunham to *Investor's Business Daily* are mere puffery, with the exception of his statement that revenue from outsourcing will increase from its current rate. The plaintiffs do not plead facts sufficient to raise a strong inference that Dunham had the requisite scienter

36

respecting the falsity of their latter statement.

Paragraph 46 quotes statements from a February 24, 1998 INSpire press release announcing INSpire's contract with Brazilian insurer Sul America to provide a software system "for all of its non-auto business that will automate the processing of one-half billion dollars worth of policies," that INSpire "will install its PC-based software system, Windows into Property and Casualty System (WPC), in 16 Sul America branch locations throughout Brazil over a 12 month period," that "[t]he majority of the installation process will be coordinated by INSpire's branch office in Columbia, S.C., and Sul America's home office in Rio de Janeiro" and that "[t]he joint installation team will work closely with INSpire's in-house software development team."[14]

In paragraph 48, the plaintiffs allege that "defendants" (not otherwise identified) omitted material details about the Sul America contract from the February 24 press release by failing to disclose that INSpire was required to purchase a performance bond in the amount of $3.7 million and that the contract was segregated into three phases. Which, if any, of the individual defendants knew of those provisions is not alleged. The plaintiffs also allege therein that "defendants [not otherwise identified] knew that the volume at large companies was simply too much for the WPC

[14]Because the February 24 press release contains no identification of statements as forward looking and does not include any cautionary language, it does not fall within the first prong of the forward looking statement safe harbor.

37

system to handle;" that unidentified "Senior installers told defendants that what INSpire was attempting with WPC at Sul America was an impossibility;" that unidentified INSpire "IT personnel" told "INSpire management repeatedly that it was, in effect, installing nothing more than a test product at Sul America;" and that "defendants thus knew that Sul America would be dissatisfied and that the completion of all phases of the contract would not materialize." These allegations improperly rely on group pleading and fail to identify any individuals made aware of the software's purported inadequacies; the allegations likewise fail to identify any individuals who made the statements about the software or Sul America, or where, when or on what occasion(s) the statements were made and whether they were oral or written or both. These allegations are hence insufficient to give rise to a strong inference of scienter on the part of any one individual.[15]

Paragraph 51 reproduces statements from an analyst's report discussing the analyst's assessment of the insurance claims administration market and INSpire's general strategy, none of which contain any alleged misstatements. Paragraphs 52 through 54 address INSpire's March 23, 1998 filing of SEC Form 10-K and its

---

[15]The allegations concerning failure to mention the surety bond and contract phasing provisions are also deficient in that the factual allegations of the Complaint do not reflect, and it does not otherwise appear, that the omission of these details from the press release rendered it misleading. Moreover, a copy of the Sul America contract was filed with the SEC in connection with the March 1998 secondary offering, all without any apparent adverse effect on the market price of INSpire stock.

38

March 26, 1998 Prospectus/Registration Statement pursuant to its stock offering.  None of the statements in the Prospectus cited by the plaintiffs are attributed to any of the individual defendants.  The plaintiffs also fail to explain how the general plans outlined in the Prospectus were false when made.  Finally, while the plaintiffs identify omissions such as the surety bond and the alleged limitations of INSpire's software, they do not plead facts that give rise to a strong inference of scienter as to these omissions, because they do not aver when any individual defendant either became aware of the software problems or acted with severe recklessness in being unaware of them.  Paragraph 55 cites forward-looking statements in a broker's report for which the defendants are not accountable because they represent the analyst's own opinion as to INSpire's future performance, as indicated by the fact that they are prefaced with the words "[w]e believe."  Paragraph 56 quotes comments by Dunham in his letter accompanying INSpire's Annual Report to Shareholders that consist of factual statements about INSpire's business strategy and recent developments, including statements such as an allusion to the Sul America contract, and puffing, including statements such as "We enter 1998 with a great deal of momentum."

Paragraph 57 recites alleged omissions that were necessary to make the statements cited earlier not misleading and attempts to plead scienter.  The plaintiffs, however, critically fail to plead with particularity facts that would give rise to a strong inference

39

of scienter on the part of any individual defendant.

In paragraph 57(a), note 3, plaintiffs allege that WPC "was first developed solely as an administrative system for personal lines of homeowners auto insurance. . . . Although defendants sold WPC as a complete solution for the administration of both personal and commercial lines, WPC only been designed for personal auto insurance and was not yet capable of processing commercial lines."[16] Plaintiffs also allege the inability of WPC and EmPower to run simultaneously and interface with each other, that EmPower originally could not correctly scan typewriting or handwriting, that it was fixed as to typewriting but INSpire could not fix it for handwriting, though most applications were handwritten. ¶ 57(e). It is also alleged that "Defendants knew EmPower did not work when INSpire bought it" in May 1997 and that "[t]he original designer and developer of EmPower, SDS, designed the product for small networks only. INSpire therefore knew before the purchase of the EmPower system that EmPower was not designed for high volume networks." ¶ 57(f). Plaintiffs also allege that INSpire programmers, despite ongoing efforts to do so, were never able to successfully modify these software programs to process the volume and complexity of policies maintained by Sul America and other unspecified clients with whom INSpire contracted. They further allege that "INSpire insiders, including, but not limited to,

---

[16]Paragraph 57 also essentially repeats the allegations of paragraph 48, herein above discussed and held insufficient.

defendants Lynn, Robinson, and Dunham, were repeatedly told by INSpire programmers and developers that EmPower would never work as defendants had represented it to work." ¶ 57(f). This allegation, however, is insufficient because it fails to state when, where or on what occasion or occasions this occurred, fails to in any way identify the INSpire programmers and developers involved, and does not indicate whether their statements were oral or written or given any meaningful particulars as to what was stated.

The Complaint alleges that "at least one" INSpire officer directed the faking of a demonstration, but does not specify which officer did so, when he did it, or where. Complaint, ¶ 57(d). Similarly, the Complaint also fails to specify when (other than "throughout the Class Period"), where, to whom, whether orally or in writing, in what context or setting, and in reference to what particular products or aspects thereof, the "smoke and mirrors" remarks were made by unidentified "employees in the IT department," unidentified "managers" and "even Defendant Gaines" to refer to INSpire's "software products." Complaint, ¶ 57(b). The plaintiffs likewise fail to specify when and where defendant Lynn made his alleged comments that EmPower, one of INSpire's software programs, "did not work." Complaint, ¶ 57(f). No date more specific than the class period is provided for these remarks and "meetings with upper management" is too vague of an indication of where or to whom the alleged comment was made. Complaint, ¶ 57(f). Nor is any indication given as to what particular function of the program Lynn

41

was addressing. The plaintiffs also cite Robinson's alleged statements to unidentified INSpire IT personnel who questioned the functionality of the company's software programs to "get with the program or get out the door." Complaint, ¶ 57(b). While this statement may suggest Robinson harbored an intent to deceive, the plaintiffs fail to identify when and where Robinson made this statement, or what particular function of what program was being addressed, and therefore do not meet the particularity requirement for pleading facts giving rise to a strong inference of scienter on Robinson's part. The plaintiffs also allege that unidentified "INSpire engineers regularly read" unidentified INSpire "press releases" and joked to one another, "I didn't know it could do that" as to unidentified claims made about the capabilities of INSpire's software. Complaint, ¶ 57(c). In addition to the fact that this statement is suggestive of the state of mind of the engineers rather than of any other individuals, the plaintiffs again fail to identify the elements of "who, when, and where" needed to plead scienter with particularity. It is also alleged that the defendants "knew that EmPower was incapable of interfacing with other vendors' systems or insurers' proprietary systems" even while the software was marketed as an integrated, turnkey solution. Complaint, ¶ 57(g). This allegation fails as to the individual defendants, however, because it relies on "group pleading" and does not set forth with particularity how and when any of the individual defendants became aware of this alleged problem with EmPower. The

42

plaintiffs further allege that INSpire "was manipulating the amounts charged to Millers to improve INSpire's reported results," but they fail to plead when, where, and at who's direction this occurred. Complaint, ¶ 57(h). The remaining allegations enumerated in paragraph 57 rely on "group pleading" and fail to allege with sufficient specificity the "when and where" elements needed to meet the requirement of pleading facts with particularity to show scienter.

*April 22, 1998 – August 14, 1998*

With paragraph 58, the plaintiffs move to the second sub period, April 22, 1998, to August 14, 1998. Paragraphs 58 through 68 recount statements by INSpire and its executives in corporate documents and a newspaper article, as well as statements by brokers and analysts. The statements address earnings and revenue estimates, the Paragon acquisition, and contracts INSpire entered into with Sul America, Kemper Insurance, Atlantic Preferred Insurance Company, Harbor Insurance, Orion Capital Companies, and Patterson Insurance Company to provide claims administration software. Many of the statements in these paragraphs are forward-looking and large portions of the analysts' reports consist of the opinions and forecasts of the analysts themselves, unaccompanied by any allegation of entanglement or ratification by any defendant. Furthermore, many of the statements allegedly made by an identified defendant in these paragraphs are mere puffery, such as Dunham's statement that "[t]he first quarter of 1998 was extremely

43

significant for INSpire Insurance Solutions."  ¶ 58.  With regard to each of the statements alleged by the plaintiffs in these paragraphs, the plaintiffs fail to plead at least one of the following elements with particularity: when the statements were made, where they were made, and sufficient allegations for charging any individual defendant with them.  As with the allegations concerning the first sub period, the plaintiffs do not explain in connection with or closely following the allegations concerning the making or issuance of the statements alleged in this section how the statement was false or misleading, or how and when any identified individual defendants knew, or was severely reckless in not knowing, the inaccuracy of the statement.  To the extent why a particular statement is false or misleading is explained and scienter is pleaded, this occurs in paragraph 69.

Paragraph 69, like paragraph 57, is where the plaintiffs attempt to plead scienter as to the facts alleged during this sub period.  Paragraph 69 simply repeats many of the allegations contained in paragraph 57, adding only:

> "(n) INSpire had taken an excessive charge for purchased research and development in connection with its acquisition of Paragon, writing off $2 million rather than the $400,000 which should have been recognized.  Thus, INSpire was understating the goodwill amortization charge which should have been expensed in every quarter after the acquisition.
> (o) As a result of the aforementioned factors, the defendants actually knew that their forecasts of 40% earnings growth in 1999 to $0.86 where in fact unreasonable and false."

44

These allegations fail to plead with particularity facts giving rise to a strong inference of scienter because they rely on "group pleading" insofar as they fail to identify which of the individual defendants knew that the forecasted earnings growth was false. The above allegations also fail to allege which defendants, if any, were aware of the specific factors mentioned in ¶ 69(n) that form the basis of the allegation in ¶ 69(o), which would be merely conclusory absent scienter as to the facts in (n). Moreover, these allegations also fail because they do not explain how any defendant knew, or was severely reckless in not knowing, the proper way to expense the goodwill amortization charge for the Paragon acquisition, or that the forward-looking earning statements were false when made. The remainder of paragraph 68 suffers from the same fatal "group pleading" and lack of particularity defects explained above in reference to the essentially identical allegations set forth in paragraph 57.

*September 28, 1998 – November 16, 1998*

With paragraph 70, the plaintiffs begin their recitation of allegations concerning the sub period running from September 28, 1998, to November 16, 1998. Paragraphs 70 through 79 recount INSpire's September 28 announcement of two software sales contracts, its October 21 press release addressing its third quarter 1998 results, and its November 1, 1998 announcement of a 10-year outsourcing agreement with Arrowhead General Insurance Agency to use INSpire's software and personnel to process their

45

claims. The Complaint also recites INSpire's discussions with analysts during this time and the subsequent favorable reports released by these analysts. Complaint, ¶ 76-79. The Complaint charges that, during this time, Durham and other individual defendants took advantage of the alleged inflation of INSpire's stock price, which had increased to $35 3/8 a share, by selling 106,150 shares of their stock for $3.2 million. Complaint, ¶ 80. INSpire shares had traded between $22 and $25 from October 22 through October 30, 1998. Before October 30, INSpire had traded as high as $27 on only two days ($27.75 on September 16 and $27.125 on September 15, 1998). From November 3, 1998, through December 10, 1998, INSpire did not trade below $30 per share, and for several days traded at or above $33, reaching its high of $35.25 on November 23, 1998. On December 11, INSpire issued a press release reducing its estimate of 1999 earnings from $0.90 to $0.84 per share "due to lower than expected margins" on the Arrowhead contract "as well as a decrease in anticipated revenues from another outsourcing contract." Complaint ¶ 82. The price of INSpire stock fell from $30.813 on December 10 to $17.625 the next day. It remained below $20.00 until the latter part of April 1999, and after December 10, 1998, never traded as high as $22.00.

Many of the complained of statements alleged in these paragraphs are forward-looking, represent the opinions of analysts as to which facts are not alleged showing any defendant to bear liability, or consist of mere puffery. Except as below noted, with

46

regard to each of the statements alleged by the plaintiffs in these paragraphs, the plaintiffs fail to plead at least one of the following elements with particularity: when the statements were made, where they were made, and sufficient allegations for charging any individual defendant with them. As in the earlier two sub periods, the plaintiffs largely fail to explain in connection with or shortly after the allegations concerning the making of the statements alleged in this period how that statement was false or misleading, or how and when any individual defendant knew or was reckless in not knowing the inaccuracy of the statement. Instead, to the extent the false or misleading nature of a particular statement is explained and scienter pleaded at all, this is generally saved for paragraph 81.

Paragraph 81 largely replicates the allegations contained in paragraphs 51 and 69, adding only the following new averments:

> "(o) The Arrowhead deal would require a major infusion of money to make it profitable and would not provide earnings to INSpire for at least a year.
> (p) Arrowhead was not servicing enough policies to generate anywhere close to $35 million in revenue in year one under the contract. There were approximately 20,000 policies involved with the Arrowhead deal and this number of policies could not possibly generate $35 million in revenue for INSpire.
> (q) INSpire was completely unprepared to handle a project as large as Arrowhead. INSpire did not have employees qualified to install a product for a company such as Arrowhead. Furthermore, the products sold to Arrowhead were not designed to service a company of Arrowhead's size.
> (r) Ultimately, INSpire was forced to lay off close to 10% of its workers due to INSpire's need to

47

discontinue its efforts to develop licensed software packages. The Company's software services and licensing business deteriorated until this layoff became necessary.
(s) As a result of the aforementioned factors, the defendants actually knew that their forecasts of 40% earnings growth in 1999 to $0.86 and in 2000 to $1.20+ were in fact unreasonable and false."

These allegations are plagued by the same defects as those in the previous class periods. First, the averments in ¶ 81(o) through (s) rely on "group pleading", as they fail to identify any individual. Second, these averments do not themselves allege when, where, and how any individual knew, or was severely reckless in not knowing, that INSpire was incapable of performing the Arrowhead contract. Nor do the plaintiffs explain how or when any individual actually knew the forward-looking estimate in (s) was false when made. As such, these allegations by themselves fail to allege with particularity facts that, absent additional evidence, would give rise to a strong inference of scienter on the part of any individual.

Paragraph 76 alleges that "[i]n connection with the [November 1, 1998] release announcing the [Arrowhead] agreement . . . Dunham and Smith spoke to securities analysis" and "[d]uring these conversations with analysts, Dunham and Smith directly disseminated important information into the market, stating: [t]he deal would add $0.05 per share to 1999 earnings and beyond that so that the Company would be on track to report EPS of $1.20 in 2000" and "[t]he cost to INSpire . . . would be $28 million in cash and stock

48

options" and the deal "would generate $35 million in year one revenues." While this is a forward looking statement, it cannot be ascertained from the record whether it was accompanied by meaningful cautionary language; hence, it is actionable if made with actual knowledge of its false or misleading character. A little more than a month after these statements, on December 11, 1998, INSpire revised downward its 1999 earnings forecast, citing lower than anticipated margins on the Arrowhead contract. Nothing in the record suggests any knowledge INSpire or Dunham had in this respect on December 11 that they lacked in early November. The day following the December 11 announcement, INSpire stock fell by about 42 percent of its value the preceding day. On November 4 and 5, only a few days after the November 1 Arrowhead announcement and Dunham's comments in that respect, Dunham sold 69,150 shares of INSpire, 16.56% of his holdings, for total proceeds in excess of $2 million. His average price per share was over $30, well above what the stock had been trading for before November 1, and likewise more than 30% higher than what it would ever trade at after December 10.

We conclude that these Dunham sales and this sequence of events, considered in light of all the other facts and circumstances alleged, including Dunham's position as CEO, which he had held ever since INSpire was spun off, his total sales throughout the class period of over 40 percent of his INSpire stock, and his personal involvement in promoting the Arrowhead contract and touting the increased revenues and earnings it would

49

produce, suffice, albeit only barely so, to create a strong inference of the requisite scienter on Dunham's part in regard to his early November statements in connection with the Arrowhead announcement.[17]  Because it is alleged that Dunham, with the requisite scienter, made these statements as INSpire's CEO and on its behalf, and in the course of his INSpire employment, INSpire's respondent superior liability for those statements is also adequately alleged.  *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1118 (5th Cir. 1980).

*December 11, 1998 – August 16, 1999*

Beginning in paragraph 82, the plaintiffs outline their allegations relating to the fourth sub period, which runs from December 11, 1998, to August 16, 1999.  In December 1998, INSpire revealed a decline in earnings growth and disclosed that the Arrowhead contract would not generate earnings previously forecast, causing the price of INSpire stock to decline from $30 to $17.

---

[17]It is alleged that Smith also made such statements, but Smith made no stock sales at any time during the class period. While Robinson, Gaines and Lynn sold shares in early November 1998 they each sold significantly less than Dunham then sold (Robinson and Gaines less than one sixth of what Dunham then sold, Lynn less than a fourth; Robinson and Gaines then sold a smaller percentage of their shares than did Dunham, Lynn sold a slightly larger percentage of his), and, more importantly, they are not identified in connection with any statements between October 22 and December 12, 1998, or concerning the Arrowhead contract.

We do not hold that the establishment (on summary judgment or at trial) of context facts not addressed in the Complaint could not preclude a finding of actual knowledge against Dunham; this appeal addresses only the sufficiency of the Complaint.

Complaint, ¶ 82. On January 26, 1999, INSpire released its fourth quarter 1998 and 1998 results, followed by its SEC 10-Q and 10-K filings on March 24 and 25. Complaint, ¶ 87, 92, 93. On March 29, INSpire announced a 10-year contract with auto insurer Robert Plan Corp. to provide claims administration using INSpire's WPC software. This contract was highlighted in the company's April 21 release of its first quarter 1999 results. Complaint, ¶ 94, 99. On May 14, INSpire filed its 10-Q for the 1999 first quarter. Complaint, ¶ 104. On June 17, INSpire announced its 10-year contract with Island Insurance for claims administration, stating that it "will produce many positive results." Complaint, ¶ 105.

Many of the statements in these paragraphs are forward-looking, represent the opinions of analysts as to which defendants do not bear liability, or consist of mere puffery. Apart from the SEC filings, plaintiffs fail to plead with particularity when the statements in these paragraphs were made or where they were made. As with the previous sub periods, the plaintiffs fail to explain in connection with or shortly after the allegations concerning the making of statements alleged in this section how that particular statement was false or misleading, or how and when any individual defendant knew, or was severely reckless in not knowing, the inaccuracy of the statement. To the extent misstatements or omissions are identified and scienter is pleaded, that is done in paragraph 109.

51

Paragraph 109 repeats numerous allegations contained in paragraphs 51, 69, and 81, adding the following averments relating primarily to the Robert Plan and Island Insurance contracts:

> "(g) When negotiations began with The Robert Plan Corporation to use the new EmPower program with their outsourcing, EmPower still was not close to functioning. The workflow processing capabilities were not working and many of the technical problems outlined above remained. INSpire programmers had many conversations with defendants Robinson and Lynn, telling them explicitly that EmPower was not ready to be used with the Robert Plan contract.
>
> (h) Also, as occurred with Sul America, WPC was not designed to handle processing for large insurance companies such as Robert Plan. WPC was designed for insurance companies that processed approximately $20-$80 million in policies per year as opposed to the Robert Plan which processed more than $100 million in policies per year. Because WPC was designed for smaller insurance companies, it had limited processing power and speed. WPC was designed to run a processing cycle each night. During that cycle, the system goes through all of the policies. Because of its design, WPC could only process a limited number of policies a night. Because RPC had so many policies, however, WPC did not have the capability to process all of Robert Plan's policies every night. Although the contract between INSpire and Robert Plan called for full implementation of WPC within a twelve-month period, defendants knew that this was totally unrealistic. Defendants knew that it would take a year just to perform a requirements study and to test the system.
>
> (i) In a June 2000 meeting, defendant Robinson told attendees at the InsPIRE Senior Staff Meeting that INSpire knew when it signed the Robert Plan contract that it could not meet the implementation schedule, but that INSpire signed the contract anyway to "get the business."
>
> (j) In a January 7, 2001 article in The Fort Worth Star-Telegram, John Pergande, the new CEO of INSpire, admitted that in 1999 revenue failed to materialize and projects lagged 'largely because *the company didn't have the resources to execute*

52

*the contracts it signed*.' In a January 14, 2001 article in the Sheboygan Press, authored by Martha H. Shad, Pergande discussed the INSpire business model and Pergande admitted, 'I believe that in the past *when a customer said they wanted something by a certain date, it was promised whether it was feasible or not.* We're not going to do that anymore . . . ."

(k) After all the failures enumerated above, INSpire then tried to make EmPower work with WPC. INSpire first tried this with customer Arrowhead Insurance, then at Island Insurance and Robert Plan. Although INSpire was promising workflow solutions to these clients, EmPower was not even close to functioning with WPC.

(l) Defendants told Island Insurance that WPC could be used for policy and claims administration of both their personal and business lines of insurance. However, WPC was not functional on administration of business lines of insurance. The inability of WPC to handle commercial processing is the reason that Island Insurance terminated their contract with INSpire. Jim Strickland, Vice President of Sales and Marketing, at the instruction of Dunham, told Island Insurance that WPC could rate commercial properties. This promise was made even though WPC was not in fact capable of rating commercial lines and was not designed to rate commercial lines and Dunham knew it."

The allegation in (g) that, when negotiations began with Robert Plan, the EmPower was not close to functioning does not allege particular facts giving rise to a strong inference of scienter on the part of any of particular individual. In addition, the subsequent allegation concerning conversations between unidentified INSpire programmers and Robinson and Lynn fails to indicate when or where such conversations occurred. The allegations set forth in (h) suffer from the "group pleading" defect, as they fail to delineate among the individual defendants as to their state of mind with respect to the alleged unsuitability

53

of the WPC software for performing the Robert Plan contract. These allegations also fail to explain when and how any particular individual defendant came to know, or was severely reckless in not knowing, of the asserted mismatch between the capabilities of the WPC software and the demands of the Robert Plan contract. The allegation in (i) that Robinson told attendees at "a June 2000 meeting" of INSpire senior staff that "INSpire knew when it signed the Robert Plan contract [in March 1999] that it could not meet the implementation schedule," is insufficient because, in addition to its overly vague identification of the meeting, it contains no information suggesting such knowledge on the part of any identified individual nor any indication of any basis on which (or when) Robinson reached the general conclusion he allegedly expressed. The allegations set forth in (j) concerning January 2001 statements lack particularity because they refer only vaguely to the company's conduct and state of mind "in the past," which is overly vague. The allegation in (k) that after diverse failures "INSpire then tried to make EmPower work with WPC" for customers Arrowhead, Island and Robert Plan, but "EmPower was not even close to functioning with WPC," does not allege facts giving rise to a strong inference of scienter as to any individual. In (l) the allegation that Strickland, at Dunham's instruction, "told Island Insurance that WPC could rate commercial lines" even though it could not "and Dunham knew it," is likewise insufficient in that no facts are stated as to how or when that was known by Dunham, nor

54

when, where, how or to what person Strickland so informed Island.

*October 15, 1999 – March 31, 2000*

On October 15, 1999, INSpire announced large write-offs and disappointing third quarter 1999 results. Complaint, ¶ 110. After negative reports by analysts reacting to this news, INSpire's stock price dropped below $4 per share. ¶¶ 111-113. The Complaint describes how a number of INSpire's clients terminated contracts with the company and, in some cases, sued INSpire for breach of contract. Complaint, ¶ 114-116. In January 2000, INSpire reported its financial results for the fourth quarter and year ended December 31, 1999, all of which showed substantial net losses. Complaint, ¶ 118. The Complaint alleges that, subsequent to December 31, 1999, INSpire's stock price dropped below $1 per share. Complaint, ¶ 118. Lastly, the Complaint avers that INSpire's then President, Smith, resigned effective January 7, 2000, CFO Kenneth Meister resigned effective March 31, 2000, executive Eric Yerina resigned, and defendant Robinson was fired and sued INSpire. Complaint, ¶ 119. The foregoing paragraphs summarizing INSpire's decline do not identify alleged misstatements or omissions, nor do they address any individual's scienter. We agree with the district court that, because fraud cannot be proved by hindsight, subsequent lawsuits are unpersuasive of scienter, as they do not show what any particular individual knew, or was severely reckless in not knowing, at the time the contracts were entered into. The subsequent resignations of INSpire executives is

55

similarly unavailing as proof of the commission of fraud by these or other individuals.

*Financial Reporting*

The next section of the Complaint concerns INSpire's allegedly false financial reporting throughout the overall class period. The plaintiffs allege that the defendants reported inflated revenues and earnings, improperly recognized revenues, improperly accounted for goodwill, improperly capitalized software development costs, and failed to record losses for uncollectible receivables. The plaintiffs contend that all of these INSpire practices violated GAAP. This section relies largely on "group pleading" and fails to plead facts with sufficient particularity to generate a strong inference of scienter as to any individual. The only reference to any individual defendant in this section is in paragraph 121 where plaintiffs allege:

> "In fact, during 1998, Dunham once threw a financial report back at Gaines because Dunham did not like the numbers reflected in that report. Gaines informed an employee who had witnessed the incident that when Dunham did not like the numbers reflected in a financial report, Dunham would insist that Gaines change those numbers. Referring to George Dunham, Gaines told one INSpire employee, "He wants me to write down numbers that don't exist." Dunham also instructed financial reporting managers to back-date contracts in order to inflate INSpire revenues for specified periods."

While these allegations bear upon Dunham's general state of mind, they are not stated with sufficient particularity, as they fail to state when, other than sometime during 1998, and where Dunham allegedly acted in this manner, and there is an entire

56

failure to relate or connect the matters set out in the above quoted allegations to any particular alleged misstatement or omission in any of INSpire's financial reports (or, indeed, to any particular such report).

*Conclusion as to primary violations*

In conclusion, we hold that the Complaint fails to properly plead *any* section 10(b) or Rule 10(b)(5) violations *except* on the part of Dunham with respect only to his November 1998 statements made in connection with the Arrowhead contract announcement, and on the part of INSpire, with respect to those same Dunham statements, as having respondeat superior liability for those violations by Dunham.

*Section 20(a) control person liability*

The Complaint seeks to also impose control person liability under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), but only as to Dunham and INSpire.[18]  Control person liability is secondary only and cannot exist in the absence of a primary violation. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).  Accordingly, the district court, having determined that the Complaint alleged no primary violation, also dismissed the section 20(a) claims.  We have concluded that

---

[18]Control person liability was also sought to be imposed on Millers, but the appeal as to Millers has been severed out into a separate case (see note 1 above) and we do not consider any matter as to Millers.

57

the Complaint alleges no primary violations on the part of any defendant except only as to Dunham respecting only his November 1998 statements in connection with the Arrowhead contract announcement and as to INSpire, on the basis of respondeat superior, respecting those same statements by Dunham. Dunham obviously can have no section 20(a) liability for his own statements. INSpire can have section 20(a) liability for a primary violation by its employee Dunham, *see Martin v. Shearson Lehman Hutton, Inc.*, 986 F.2d 242, 244 (8th Cir. 1993), but INSpire would in any event have respondeat superior liability for the referenced primary violations by Dunham. *Paul F. Newton & Co.*, 630 F.2d at 1118.[19] Accordingly, our holding renders the section 20(a) claims against Dunham and INSpire either invalid, as based on no properly alleged primary violation, or essentially immaterial.

*Failure to grant leave to amend*

Plaintiffs complain that the district court failed to grant them leave to amend the Complaint.

At the very end of their lengthy response to defendants' motion to dismiss the Complaint, plaintiffs stated:

> "For the foregoing reasons, plaintiffs respectfully request that defendants' motion be denied. If, however, the Court dismisses the Complaint, plaintiffs request leave to replead. Federal Rule of Civil Procedure 15(a) directs that leave to amend 'shall be freely given when

---

[19]Section 20(a) liability is generally subject to the affirmative defense of lack of participation and good faith. *See Abbott v. Equity Group*, 2 F.3d 613, 619 (5th Cir. 1993).

58

justice so requires.'"

So far as the record reflects, this is the entirety of what plaintiffs communicated to the district court concerning amendment to the Complaint. Plaintiffs never at any time either tendered a further amended Complaint or advised the district court of how or in what manner they would amend the Complaint or what allegations would be added or deleted if allowed to do so.[20] Nor have plaintiffs at any time suggested they have relevant information they were unaware of when the Complaint was filed (or that the defendants' motion to dismiss did not adequately inform them of the asserted deficiencies in the Complaint).

Moreover, the district court's prior order of dismissal specifically found that "Plaintiffs should have *one* more opportunity to amend their pleadings in accordance with the requirements of Rule 9(b) and the PSLRA" (emphasis added) and granted the plaintiffs until "April 16 [subsequently extended to May 16], 2001 to file an amended complaint *that complies with this order*" (emphasis added). That earlier order specifically noted that "the PSLRA requires that securities-fraud claimants allege particular facts demonstrating the required state of mind," and that the consolidated complaint failed to meet this standard. The

---

[20]On appeal plaintiffs only inform us that "plaintiffs could bolster an already compelling case of fraud, by pleading additional facts corroborating the Complaint's present allegations" and "plaintiffs have material that could be added to an amended complaint (while preserving, of course, their counsel's work-product privilege)."

earlier order also stated that the consolidated complaint "contains numerous allegations against the defendants collectively or against several defendants in the alternative" and was hence defective "because of its reliance on group pleading," which was "wholly inconsistent with the strict-pleading requirement of the PSLRA" under which plaintiffs "'must properly plead wrongdoing and scienter as to each individual defendant.'" Further, that order noted that contrary to the requirements of the PSLRA, the consolidated complaint "wholly fails to allege facts supporting an inference the forward-looking statements to which they refer were made with actual knowledge that they are false or misleading."

In its subsequent order dismissing the Second Amended Complaint and denying further opportunity to amend, the district court specifically noted these holdings of its prior dismissal order and that it had allowed plaintiffs "one more opportunity to amend." That order goes on to correctly observe that "Plaintiffs have persisted in their reliance on the group-pleading doctrine despite this Court's previous Dismissal Order finding such method of pleading inadequate," that "[t]he Second Amended Complaint is replete with instances of group pleading," that (except for jurisdictional and class action/party identification allegations and quotations from press releases and analyst reports) "virtually every paragraph in the Second Amended Complaint to some degree relies on group pleading," and that these allegations are hence inadequate. This order likewise notes (correctly) that "Plaintiffs

60

have also continued to rely heavily on forward-looking statements." We further note that the district court correctly characterizes the Second Amended Complaint as "a 'labyrinth'" which makes "it highly difficult for the Court to assess" its sufficiency "under Rule 9(b) and the PSLRA."

Under these circumstances it is clear that the district court acted well within its discretion in concluding that plaintiffs should not be afforded yet another opportunity to replead.  *See, e.g., Goldstein*, 340 F.3d at 254-55; *Tchuruk*, 291 F.3d at 362.  *See also, e.g., US Ex Rel Doe v. Dow Chemical Co.*, 343 F.3d 325, 331 (5th Cir. 2003); *Rosenzweig,* 332 F.3d at 864-65.

## Conclusion

We hold that the district court erred in dismissing so much of the Complaint as charges Dunham with a section 10 and Rule 10(b) violation in respect to his early November 1998 statements in connection with the Arrowhead contract announcement and erred in dismissing so much of the Complaint as charges INSpire with respondeat superior liability under section 10 and Rule 10(b) respecting those same statements.  We also hold that the district court did not err in dismissing all other claims of section 10 and Rule 10(b) primary violations and all section 20(a) control person liability claims in respect to such properly dismissed primary violations.  Finally, we hold that the district court did not abuse its discretion in failing to afford plaintiffs the opportunity to

61

further amend.

The judgment of the district court is accordingly AFFIRMED in part; REVERSED in part; and REMANDED for further proceedings not inconsistent herewith.